# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| **JESSE GUZMAN**, <br> 4207 Elmway Dr. <br> Toledo, OH 43614 <br><br> Plaintiff, <br><br> v. <br><br> **USAA FEDERAL SAVINGS BANK**, <br> 9800 Fredericksburg Rd. <br> San Antonio, TX 78288 <br><br> and <br><br> **NATIONSTAR MORTGAGE LLC**, <br> 8950 Cypress Waters Blvd. <br> Dallas, TX 75019 <br><br> Defendant. | Case No. <br><br> Judge <br><br> **COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Jesse Guzman, through counsel, for his *Complaint for Damages* against Defendants USAA Federal Savings Bank and Nationstar Mortgage LLC, states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Jesse Guzman ("Guzman" or "Plaintiff") is the owner of residential real property, located at and commonly known as 4207 Elmway Dr., Toledo, OH 43614 (the "Home").

2.      Guzman currently maintains the Home as his primary, principal residence, and has so maintained the Home for all times relevant to the allegations of the Complaint.

3.      Defendant USAA Federal Savings Bank ("USAA") is a federally-chartered national savings association that is organized and exists under the National Banking Act, with its principal place of business located at 9800 Fredericksburg Rd., San Antonio, TX 78288.

4.      USAA is the master servicer of the Loan.

5.      Defendant Nationstar Mortgage LLC ("Nationstar") is a foreign corporation incorporated under the laws of the State of Delaware that maintains its headquarters and principal place of business at 8950 Cypress Waters Blvd., Dallas, TX 75019.

6.      Nationstar is the subservicer of a note executed by Guzman (the "Note") and of a mortgage on the Home that secures the Note (the "Mortgage") (collectively, the "Loan").

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA) and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* (RESPA).

8.      This Court has supplemental jurisdiction to hear any state law claims that are plead herein or that may subsequently arise pursuant to 28 U.S.C. § 1367.

9.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## SUMMARY OF CLAIMS

10.      This action is filed to enforce statutory provisions of RESPA, as well as regulations promulgated by the Consumer Financial Protection Bureau (CFPB) and that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, et seq. ("Regulation X").

11.      In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

12.      Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 Fed. Reg. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

13.     Guzman asserts claims for relief against USAA and Nationstar (collectively, "Defendants") for violations of the specific rules under RESPA and Regulation X, as set forth, *infra*.

14.     Defendants are each a mortgage servicer as defined by RESPA and Regulation X. 12 U.S.C. § 2605(i)(2); 12 C.F.R. § 1024.2(b).

15.     RESPA allows for vicarious liability and USAA is responsible for the actions of its subservicer Nationstar. *See Feldmann v. Lakeview Loan Servicing LLC*, No. C20-580 MJP, 2021 U.S. Dist. LEXIS 80336, at *13-14 (W.D. Wash. Apr. 27, 2021).

16.     The Loan is a "federally related mortgage loan" as defined by RESPA and Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

17.     The Loan is not a "reverse mortgage transaction" as defined by RESPA and Regulation X. 12 C.F.R. § 1024.31; *see* 12 C.F.R. § 1026.33(a) (Regulation Z).

18.     Defendants are each subject to the requirements of RESPA and Regulation X, and they do not qualify for the exception for "small servicers"—as defined by 12 C.F.R. § 1026.41(e)(4)—nor for the exemption for a "qualified lender"—as defined by 12 C.F.R. § 617.7000.

19.     The Loan is secured by the Home which is Guzman's principal residence. 12 C.F.R. § 1024.30(c)(2).

20.     Mortgage servicers are prohibited from failing "to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

21. Guzman has a private right of action under RESPA and Regulation X pursuant to 12 U.S.C. § 2605(f) for the claimed violations and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

22. Guzman also asserts a statutory claim against Nationstar for violations of the Residential Mortgage Lending Act, R.C. 1322.01, *et seq.* (RMLA).

## FACTUAL BACKGROUND

23. On August 26, 2016, Guzman and his ex-wife Kelly Guzman ("Kelly") obtained the Loan from USAA.

24. In 2019 and 2020, Guzman was negatively impacted by divorce and the COVID-19 pandemic and sought mortgage loan assistance from USAA, through its subservicer Nationstar.

25. Guzman was approved for a forbearance effective with the September 1, 2020 payment for three (3) months. Prior to the expiration of the forbearance, Guzman received extensions of the forbearance for an additional six (6) months, through the May 1, 2021 payment.

26. Throughout the forbearance, Guzman offered to pay the amount outstanding on the Loan.

27. Prior to May 19, 2021, Guzman submitted a loss mitigation application to Defendants (the "Application"). Copies of Defendants' written communications relating to the Application are attached as **Exhibit 1**.

28. Throughout the loss mitigation process, Guzman would constantly wait for Defendants to acknowledge or otherwise process the documents he submitted. Defendants would routinely lose the documents submitted by Guzman. Guzman made numerous telephone calls to Defendants during the loss mitigation process to confirm receipt of his submissions where he was

subjected to excessive hold times, unresponsive customer service agents, and inconsistent statements.

29.     On or about May 19, 2021, Defendants sent Guzman correspondence requesting he complete the following in order to complete the Application ("Incomplete Notice #1"):

      a.   A Uniform Borrower Assistance Form and Hardship Affidavit;

      b.   A Borrower/Co-Borrower Acknowledgement and Agreement; and,

      c.   IRS Form 4506-T Request for Transcript of Tax Return.

*See* Exhibit 1, pp. 1-12.

30.     On or about May 21, 2021, Defendants sent Guzman an incomplete notice requesting further information and documents to complete the Application ("Incomplete Notice #1"). *See* Exhibit 1, pp. 13-15.

31.     On May 28, 2021, Guzman submitted the required documents to fully comply with Incomplete Notices #1 and #2.

32.     On May 29, 2021, Guzman contacted Defendants to confirm Defendants' receipt of the documents submitted the previous day.

33.     On or about June 2, 2021, Defendants sent Guzman correspondence stating that the Application was complete. *See* Exhibit 1, pp. 16-18.

34.     Also on or about June 2, 2021, Defendants sent Guzman a notice now stating that the Application was incomplete and that Guzman needed to provide a signed copy of his "Most recent SIGNED copy of tax return 1040s including all schedules" to complete it ("Incomplete Notice #3"). Incomplete Notice #3 noted that Defendants had everything else they required to complete the Application and that those documents did not expire. *See* Exhibit 1, pp. 19-22.

35.     Guzman submitted a signed copy of his tax returns, which he had already previously provided to Defendants, to fully comply with Incomplete Notice #3.

36.     Guzman subsequently attempted to contact the employee designated by Defendants to be the single point of contact ("SPOC") for the Loan, however she would never take Guzman's calls and failed to call him back.

37.     On June 10, 2021, Guzman contacted Defendants' customer service department after failing to receive a call back from his SPOC. After an extended wait, customer service stated that it could not reach the SPOC and offered to put Guzman through to her voicemail.

38.     On or about June 18, 2021, Defendants sent correspondence that denied Guzman for a permanent loan modification. *See* Exhibit 1, pp. 23-29.

39.     On or about June 23, 2021, Defendants contacted Guzman to notify him that Defendants intended to continue with the foreclosure process of his Home and Loan. At this time, Guzman received paperwork relating to foreclosure from Defendants.

40.     On June 30, 2021, after thirty minutes on hold, Guzman reached Defendants' loss mitigation department who stated that Defendants were not pursuing foreclosure at the time, in contrast to the earlier telephone conversation. Defendants explained that Guzman could be given another three (3) month COVID forbearance extension, through the August 1, 2021 payment.

41.     As Guzman would later find out during a telephone conversation with his SPOC, Defendants' decision to deny his request for a permanent loan modification was based on Defendants' failure to properly calculate his monthly expenses. Upon this discovery, Defendants then re-opened the loss mitigation process.

42.     On or about August 29, 2021, Defendants sent Guzman correspondence requesting he complete the same forms that are listed in ¶ 29, *supra* ("Incomplete Notice #4"). *See* Exhibit 1, pp. 30-41.

43.     On or about September 9, 2021, Guzman submitted the required documents to fully comply with Incomplete Notice #4.

44.     On October 9, 2021, Defendants contacted Guzman about Incomplete Notice #4. Guzman explained that he had submitted all the required documents and asked why Defendants were refusing to acknowledge that he had submitted documents through Defendants' website.

45.     On October 12, 2021, Guzman attempted to contact Defendants about the Application, however he was again subjected to excessive hold times and no response.

46.     On or about October 13, 2021, despite Guzman's September 9, 2021 submission, Defendants sent Guzman correspondence requesting he complete the same forms for a third time ("Incomplete Notice #5"). *See* Exhibit 1, pp. 42-53.

47.     On October 18, 2021, Guzman contacted Defendants about the Application and explained that he had recently uploaded documents that Defendants were refusing to acknowledge. Defendants instructed Guzman to email the documents to a USAA email address, which Guzman did that day.

48.     On or about October 26, 2021, Defendants sent Guzman an incomplete notice requesting further information and documents to complete the Application ("Incomplete Notice #6"). *See* Exhibit 1, pp. 54-56.

49.     On November 2, 2021, Guzman contacted Defendants about the Application and Defendants acknowledged that they received documents from Guzman but stated that further documents were needed. Guzman explained that he had submitted these documents previously,

but Defendants stated Nationstar employees could not "pull" those documents and required new copies. The Nationstar employee informed Guzman for the first time that Nationstar employees were not permitted to view documents submitted to USAA's "side of the website" and Nationstar employees received only a summary of the loss mitigation process. Guzman asked, "So all my documents that I uploaded went to the USAA side and you guys will never see them?" to which the Nationstar employee answered, "Exactly." Guzman promised to upload his previously submitted documents that day as instructed during this conversation.

50.      On or about November 17, 2021, Defendants sent Guzman an incomplete notice requesting further information and documents to complete the Application ("Incomplete Notice #7"). *See* Exhibit 1, pp. 57-59.

51.      On or about November 18, 2021, Defendants sent Guzman correspondence stating that the Application was complete. *See* Exhibit 1, pp. 60-62.

52.      On or about December 21, 2021, Defendants sent correspondence that offered Guzman a Standard Modification. *See* Exhibit 1, pp. 63-72.

53.      Guzman timely accepted the offer contained in the December 21, 2021 correspondence.

54.      On or about December 27, 2021, Defendants offered Guzman a Loan Modification Agreement (the "LMA"). Copies of the cover letter and unexecuted copies of the LMA are attached as **Exhibit 2**.

55.      On February 18, 2022, Guzman and Kelly fully executed the LMA and sent it to Defendants ("Executed LMA #1"). A copy of Executed LMA #1 is attached as **Exhibit 3**.

56.     On or about February 22, 2022, Defendants sent Guzman fresh copies of the LMA and a cover letter explaining that Executed LMA #1 was not notarized properly ("Deficiency Notice #1"). A copy of Deficiency Notice #1 is attached as **<u>Exhibit 4</u>**.

57.     Deficiency Notice #1 explains that a representative of Defendants would be contacting Guzman to schedule an appointment with a mobile notary. *See* <u>Exhibit 4</u>.

58.     Upon receipt of Deficiency Notice #1, Guzman reached out to Kelly to discuss signing the LMA paperwork again, who refused to cooperate with Guzman.

59.     Guzman contacted Defendants by telephone to explain the situation and was assured that Kelly's signature was not needed because Guzman had provided Defendants with copies of his divorce decree.

60.     On March 11, 2022, in the presence of Defendants' mobile notary, Guzman again executed two copies of the LMA, which were returned to Defendants by the mobile notary ("Executed LMA #2"). A copy of Executed LMA #2 is attached as **<u>Exhibit 5</u>**.

61.     On or about March 15, 2022, Defendants again sent Guzman fresh copies of the LMA and a cover letter stating, despite Defendants' prior representations to the contrary, that Kelly's signature was required ("Deficiency Notice #2"). A copy of Deficiency Notice #2 is attached as **<u>Exhibit 6</u>**.

62.     Upon receiving Deficiency Notice #2, Guzman attempted to schedule another appointment with Defendants' mobile notary, who declined to assist Guzman. Guzman secured his own notary, however, Kelly failed to appear at the scheduled signing.

63.     On April 7, 2022, Guzman contacted Defendants desperately seeking help to finalize the LMA. During this call, the Defendants' representative explained that the problem with

Executed LMA #2 was not related to Kelly's failure to sign the document, but rather the failure of Defendants' mobile notary to properly notarize Executed LMA #2.

64.     On or about April 8, 2022, Defendants sent a notice to Guzman stating that they withdrew the LMA because Defendants "did not receive the properly executed copies [of the LMA] as required" (the "Withdrawal Notice"). A copy of the Withdrawal Notice is attached as **Exhibit 7**.

65.     On or about June 21, 2022, Guzman submitted a reinstatement payment to Defendants. Before he submitted the payment, Guzman specifically asked if he would be reported late to credit reporting agencies. Defendants assured him that the reinstatement payment would not be reported as a late payment and confirmed that no payments would be reported as late. When Guzman reviewed his credit reports, he discovered that Defendants reported the payments as late and a serious delinquency now appears on his credit reports.

66.     In November 2022, Guzman engaged counsel for representation to request information relating to the Loan and to investigate Defendants' handling of the loss mitigation process.

67.     On November 7, 2022, Guzman, through counsel, sent the following pieces of correspondence, all classified as requests for information pursuant to 12 C.F.R. § 1024.36, to Defendants at the address designated by Defendants for receipt of requests for information and notices of error pursuant to 12 C.F.R. §§ 1024.36(b) and 1024.35(c) (the "Designated Address"):

        a.     Correspondence captioned "Request for Information Pursuant to 12 C.F.R. § 1024.36 including a request for a payoff statement pursuant to 12 C.F.R. § 1026.36(c)(3)" seeking information concerning the Loan, specifically an itemized payoff statement and the name, address, and contact information for

the current owner or assignee, master servicer, and current servicer of the Loan ("RFI #1"); and

b.  Correspondence captioned "Request for Information Pursuant to 12 C.F.R. § 1024.36" seeking additional information concerning the Loan, including a transaction history of the Loan, escrow analyses, and information related to loss mitigation, among other items ("RFI #2").

Copies of RFI #1 and RFI #2 are attached as **Exhibit 8**.

68.     On June 2, 2023, Guzman, through counsel, sent two copies of a notice of error pursuant to 12 C.F.R. § 1024.35 (the "NOE") to each Defendant at the Designated Address. Copies of the NOEs are attached as **Exhibit 9**.

69.     Through the NOEs, Guzman asserted that Defendants failed to exercise reasonable diligence to complete the Application, failed to properly notarize or otherwise implement the LMA, and improperly reported negative credit information to credit reporting agencies, despite promising Guzman that they would not do so. *See* Exhibit 9.

## IMPACT AND DAMAGES

70.     USAA advertises that it serves the military, veterans, and their family members. Guzman is a 100% disabled veteran who trusted Defendants each step of the way. Guzman wished to take advantage of the forbearance plan offered by Defendants, bring his loan current, and move on to a new home that better suited his family's needs. Instead, Guzman was subjected to a nightmare that he is still dealing with.

71.     Defendants communicated conflicting information to Guzman concerning his eligibility for a new home loan. Defendants told Guzman that USAA would give him a new loan, and relying upon this assurance, Guzman listed the Home for sale. The Home appraised at

$200,000.00 when Guzman intended to sell it, and he received an offer for $210,000.00. On separate occasions, Defendants then stated that Guzman was required to modify the Loan and make varying amounts of monthly payments to become eligible for a new loan. As a result, Guzman had to decline the offer to sell the Home because of the significant delay in the modification process and the new loan process, and also because he was given incorrect information from Defendants.

72.     Guzman wished to quickly move to a new home in order to better care for his ailing parents. Guzman specifically wanted a one story house to allow better access for his parents who were each confined to a wheelchair. This home was directly next door to Guzman's children's scout leader and in close proximity to other family members, including his sister who had health issues of her own.

73.     Defendants' actions caused significant and unnecessary delay, preventing Guzman from purchasing that new home. Guzman was in contract to purchase a new home when the seller, who had given Guzman multiple extensions, backed out. Guzman discovered that Defendants' loan officer had not locked in his interest rate, and three months after entering into the contract the interest rate pushed the home out of Guzman's debt-to-income ratio.

74.     Guzman was forced to work with another mortgage company in order to secure a new home. This mortgage company required written confirmation that Guzman was on a forbearance plan during the modification process. Despite agreeing to provide such written confirmation, Defendants have failed to provide such, causing further unnecessary delay. The mortgage company would have approved the new loan with this document, however, without the document, Guzman could not purchase a new home.

75.     Since the mortgage company and Guzman believed things could move forward since Defendants agreed to provide the paperwork, Guzman needed to sell the Home quickly instead of listing it again. Guzman auctioned his home and had an agreement to sell it for considerably less than the offer he received previously, but after signing and being in contract to sell it, Guzman had to back out after losing the new home. This ordeal has destroyed Guzman's real estate reputation and his relationship with the auction company.

76.     Defendants' improper actions caused Guzman to suffer from actual and proximate damages including, but not limited to:

    a.  Improper fees and charges imposed on the Loan, the collection of such fees, including any late fees and other default servicing related fees for which Guzman was personally obligated or which otherwise negatively impacted any equity in the Home to which he was entitled;

    b.  Legal fees, costs, and expenses to submit the RFIs and the NOE to Defendants in a good faith attempt to obtain information to ascertain the nature of the problems at hand and to otherwise amicably resolve this matter, or to have Defendants mitigate the harm caused to Guzman to which he did not receive a proper or adequate responses;

    c.  Guzman incurred expenses for appraisals, inspections, storage, movers, and other labor for the Home, but was prevented from selling the Home at those times. Guzman's property is still placed in storage;

    d.  Guzman has lost out on lower interest rates as mortgage rates have continued to climb, forcing Guzman to pay significantly more for a new home;

    e.   Guzman has had to carry a balance on his credit cards to pay for the fees and costs associated with his attempted purchase of the new home;

    f.   Defendants reported negative credit information to credit reporting agencies when it promised to Guzman that they would not; and,

    g.   Severe emotional distress driven by Defendants' failure to properly handle Guzman's loss mitigation submissions, Defendants' false, misleading, or inconsistent directions and statements, and Defendants' failure to provide written confirmation that the Loan was in forbearance, among other actions, which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

## PATTERN AND PRACTICE OF USAA'S
## VIOLATIONS OF RESPA AND REGULATION X

77.    USAA's actions are part of a pattern and practice of behavior in violation of Guzman's rights and in abdication and contravention of USAA's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

78.    USAA has numerous consumer complaints lodged against it nationally on the CFPB's consumer complaint database. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at the following link: http://www.consumerfinance.gov/data-research/consumer-complaints.

79.    Guzman has reviewed the CFPB's consumer complaint database and has identified narratives asserting that USAA engaged in similar conduct against other borrowers. In particular, Guzman has reviewed the fifteen (15) consumer complaints attached hereto and identified as **Group Exhibit 10**. The date, details, and a narrative disclosed by the consumer is set forth in each

complaint. The complaints show conduct which demonstrates that USAA has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

## PATTERN AND PRACTICE OF NATIONSTAR'S
## VIOLATIONS OF RESPA AND REGULATION X

80.     Nationstar's actions are part of a pattern and practice of behavior in violation of Guzman's rights and in abdication and contravention of Nationstar's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

81.     Nationstar has numerous consumer complaints lodged against it nationally on the CFPB's consumer complaint database. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at the following link: http://www.consumerfinance.gov/data-research/consumer-complaints.

82.     Guzman has reviewed the CFPB's consumer complaint database and has identified narratives asserting that Nationstar engaged in similar conduct against other borrowers. In particular, Guzman has reviewed the fifteen (15) consumer complaints attached hereto and identified as **Group Exhibit 11**. The date, details, and a narrative disclosed by the consumer is set forth in each complaint. The complaints show conduct which demonstrates that Nationstar has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

## COUNT ONE: AGAINST ALL DEFENDANTS
## VIOLATIONS OF RESPA, 12 C.F.R. § 1024.41(b) AND 12 U.S.C. § 2605(k)

83.     Guzman restates and incorporates all of the allegations contained in paragraphs 1 through 82 in their entirety, as if fully rewritten herein.

84.     12 C.F.R. § 1024.41(a) provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))."

85.  12 C.F.R. § 1024.41(b)(1) provides that "[a] servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application."

86.  Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(b)(3) provides that if no foreclosure sale is scheduled as of the date a loss mitigation application is received, the application is considered to have been received more than ninety (90) days before any foreclosure sale.

87.  When Guzman submitted the Application, there was no foreclosure sale scheduled.

88.  Defendants repeatedly requested information and documents from Guzman that they already had in their possession, they could have requested at an earlier date, or that they allowed to expire.

89.  Defendants failed to implement a system that allowed Nationstar employees to view documents submitted to USAA's website, which resulted in unnecessary delay and Defendants "losing" documents or requesting the same documents multiple times.

90.  Throughout the loss mitigation process, Guzman would constantly wait for Defendants to acknowledge or otherwise process the documents he submitted. Defendants would routinely lose the documents submitted by Guzman. Guzman made numerous telephone calls to Defendants during the loss mitigation process to confirm receipt of his submissions where he was subjected to excessive hold times, unresponsive customer service agents, and inconsistent statements.

91.  Defendants' actions constitute a failure to exercise reasonable diligence in obtaining missing or incomplete information and/or documents to complete the Application in violation of 12 C.F.R. § 1024.41(b)(1) and 12 U.S.C. § 2605(k)(1)(E).

92. Defendants' actions resulted in Defendants improperly closing out review of the Application and further unnecessary delay in the loss mitigation process.

93. Defendants' actions caused Guzman to suffer actual damages, as discussed, *supra*, at ¶¶ 70-76.

94. Defendants' actions are believed to be part of a pattern and practice of behavior in conscious disregard for Guzman's rights and in abdication of Defendants' obligations under RESPA and Regulation X.

95. As a result of Defendants' actions, Defendants are liable to Guzman for actual damages and statutory damages. 12 U.S.C. § 2605(f)(1).

96. Additionally, Guzman requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT TWO: AGAINST NATIONSTAR
## VIOLATIONS OF THE RMLA, R.C. 1322, *ET SEQ.*

97. Guzman restates and incorporates all of the allegations contained in paragraphs 1 through 82 in their entirety, as if fully rewritten herein.

98. On December 22, 2017, Ohio Governor John Kasich ("Kasich") signed into law Ohio House Bill 199 ("HB 199"), which made significant changes to the former Mortgage Brokers Act, R.C. 1322.01, *et seq.* HB 199 substantially broadened the scope of the statute, now renamed the Residential Mortgage Lending Act, to apply to mortgage lenders.

99. On December 19, 2018, Kasich signed into law Ohio House Bill 489 ("HB 489"), to again broaden the scope of the RMLA to apply to mortgage servicers. HB 489 now defines "mortgage servicer" and inserts the term into sections throughout Chapter 1322. HB 489's title specifically "require[s] registration of mortgage loan servicers."

100.    Nationstar is subject to the requirements of the RMLA and does not qualify for the exemptions listed in R.C. 1322.04.

101.    "No person ... shall act as a ... mortgage servicer ... without first having obtained a certificate of registration from the superintendent of financial institutions for the principal office and every branch office to be maintained by the person for the transaction of business as a ... mortgage servicer ... in this state." R.C. 1322.07(A).

102.    Nationstar is a mortgage servicer under the RMLA as it "holds the servicing rights, records mortgage payments on its books, or performs other functions to carry out the mortgage holder's obligations or rights under the mortgage agreement." R.C. 1322.01(BB).

103.    Nationstar, as a mortgage servicer, is required to be registered with the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.

104.    Nationstar is a registrant under R.C. 1322, as the Ohio Department of Commerce, Division of Financial Institutions has issued it certificates of registration, License No. RM.850005.000. R.C. 1322.01(HH).

105.    Guzman is a "buyer" as defined by R.C. 1322.01(I), as he is an individual whose loan is serviced by a mortgage servicer, Nationstar.

**(R.C. 1322.40)**

106.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, cannot make false or misleading statements of a material fact, omissions of statements required by state or federal law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations. R.C. 1322.40(B).

107.    Nationstar made false, misleading, and/or inconsistent statements relating to the Loan's forbearance, Guzman's request for a permanent modification, and Guzman's ability to obtain a loan for his planned purchase of a new home in violation of R.C. 1322.40(B).

108.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, cannot engage in conduct that constitutes improper, fraudulent, or dishonest dealings. R.C. 1322.40(C).

109.    Nationstar's failure to exercise reasonable diligence during the loss mitigation process, as described in Count One, failure to provide a competent mobile notary, refusal to provide written confirmation that the Loan was in forbearance, and wrongful reporting of negative credit information constitute improper and dishonest dealings in violation of R.C. 1322.40(C).

110.    As a result of Nationstar's conduct, Nationstar is liable to Guzman for actual damages, as further described, *supra*, at ¶¶ 70-76, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.52.

### (R.C. 1322.45)

111.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, is required to comply with all duties imposed by other statutes or common law, act with reasonable skill, care, and diligence, and act in good faith and with fair dealing in any transaction, practice, or course of business in connection with the brokering or originating of any residential mortgage loan. R.C. 1322.45(A)(3)-(4).

112.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322 cannot waive or modify its duties under R.C. 1322.45(A). R.C. 1322.45(C).

113.    Nationstar's violations of RESPA and Regulation constitute violations of R.C. 1322.45(A).

114.    Nationstar violated R.C. 1322.45(A)(3) and (4) by failing to act with reasonable skill, care, and diligence and in good faith and with fair dealing during the loss mitigation process, as described in Count One, through its actions in not providing a competent mobile notary for Guzman, its refusal to provide written confirmation that the Loan was in forbearance, and its wrongful reporting of negative credit information.

115.    As a result of Nationstar's conduct, Nationstar is liable to Guzman for actual damages, as further described, *supra*, at ¶¶ 70-76, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.52. R.C. 1322.45(D).

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff Jesse Guzman respectfully requests that this Court enter an Order granting Judgment against Defendant USAA Federal Savings Bank as follows:

A.    Actual damages in an amount to be determined at trial for the allegations contained in Count One;

B.    Statutory damages of Two Thousand Dollars ($2,000.00) per violation of RESPA contained in Count One;

C.    Costs and reasonable attorneys' fees as to Count One; and,

D.    Such other relief which this Court may deem appropriate.

**WHEREFORE** Plaintiff Jesse Guzman respectfully requests that this Court enter an Order granting Judgment against Defendant Nationstar Mortgage LLC as follows:

A.    Actual damages in an amount to be determined at trial for the allegations contained in Counts One and Two;

B.    Statutory damages of Two Thousand Dollars ($2,000.00) per violation of RESPA contained in Count One;

C.   Punitive damages to the extent allowed by law for the allegations contained in Count Two;

D.   Costs and reasonable attorneys' fees as to Counts One and Two; and,

E.   Such other relief which this Court may deem appropriate.

## <u>JURY DEMAND</u>

Plaintiff Jesse Guzman respectfully demands a trial by jury on all such claims that may be so tried.

Respectfully submitted,

/s/ *Marc E. Dann*
Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Michael A. Smith, Jr. (0097147)
**Dann Law**
15000 Madison Ave.
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
*Counsel for Plaintiff Jesse Guzman*